Good morning. Let's start with Bemis v. Employers Mutual Casualty Co., and Mr. Schmider, please proceed. May it please the Court, I'm Rob Schmider, along with Brett Blanken, who represent Dr. Bemis and the class of providers against Employers Mutual Casualty Co., in this case. In 1985, the Illinois General Assembly passed the Health Care Reimbursement Reform Act of 1985. And in so doing, they allow PPOs for the state of Illinois for the first time. There are antitrust concerns about PPOs. When they passed this law, the law specifically provides that there shall be incentives for patients to treat with a preferred provider. We, of course, all know that that's how PPO operates. You fast forward, and Dr. Bemis, along with many other doctors, tens of thousands of doctors in the state of Illinois, entered into contracts with First Health. First Health, or one of its predecessors' names. First Health is defined by the PPO law as an administrator who administers contracts with providers whereby beneficiaries are provided an incentive. It's right there in the definition of administrator. It's right there in the definition of beneficiary. So they enter into these agreements under the auspices of the PPO law, and that's the bargain. Now, the PPO administrators, under the law and regulations, are then authorized to complete that contractual relationship and enter into agreements with insurance companies who offer PPO programs. We fast forward to what happened in this case. What happened in this case was that there was Dr. Bemis treated an Illinois workers' compensation claimant. As we all know, compensation injured workers are allowed unfettered choice in Illinois for their treatment unless there's a panel established or they exhaust their two choices of providers. At that moment, the employer gets to choose who they go treat with, and there's an incentive to stick with that employer's choice because if the injured worker doesn't do it, it's at his own expense. And so that's a significant financial incentive. Employers took a PPO discount in this case, and all the EOR made it very clear. We're taking a PPO discount, and it said right there on the EOR that this is in accordance with PPO contract guidelines. The problem was the injured worker had unfettered choice. There was absolutely no incentive for that injured worker to go treat with Dr. Bemis based upon the workers' compensation law in this particular circumstance. And so that's why we're here. Now, that's how we get to the lawsuit. Now, why we're here is because this court, and I know, Justice Fulmer, you authored the opinion, issued Coy v. Travers in 2011. And there's a number of things we'll talk about in Coy, but the trial court here found that Coy changed the law. That Coy overruled Supreme Court precedent that the laws, in effect, the time contract is entered into, become a term of that contract. And in Coy, because that issue wasn't briefed or raised by Travers at the time, the court made a sous-fante ruling. The court acknowledged that the court was not aware of any authority where that law could become part of the contract. We pointed that out to the trial court, and the trial court said, no, I'm bound to follow Coy v. Travers over the precedent of the Supreme Court. And I'm probably one of the last attorneys of the generation that actually grew up on the law. That's a good thing. But this is such a universally accepted concept that if you turn to the contracts, section 167, existing law forms part of the contract. That's just the law. As a matter of fact, the Supreme Court has gone on to say that just because a contract is silent as to its terms, which I know you pointed out in the Coy opinion, Justice Bomer, there was nothing in there that said financial incentives itself. The Supreme Court has actually said that doesn't matter. The reason people don't repeat the law is because they presume it's there and it's unnecessary to repeat it in the contract. And so we have a situation where we have, and I think the case most directly on point is the Shiro case issued by the Supreme Court, where somebody bought a building. The seller didn't endorse a sewer or septic system in accordance with the municipal code, and they sued. Brought a breach of contract claim, said you should have brought it. You didn't comply with the code. Trial court said, well, there's no, literally, there are no provisions in there that address this so you can't assert a contract claim. And that's normally true. We get up to the Supreme Court, and the Supreme Court said, no, it's there. It's there by operation of law. And reversed the dismissal of the breach of contract claim. And so we had a conflict between Coy versus Travelers and Shiro. And I think as we all learned, whether it was the first or second year of law school, when there's a conflict, and the case law is very clear, the trial court was bound to follow the Supreme Court ruling on this thing and determine that this court, with all due respect, has no ability to change the precedent of the Supreme Court. Only the Supreme Court can do that. And therefore, the trial court was bound to follow that. But the trial court didn't do that here. The trial court said, no, Coy versus Travelers changed the law and decertified the class. Then we filed a petition on the decertification issue to try to raise this issue. Was there a change in circumstances? This court and the Supreme Court didn't address it. And then we get back down to the trial court, and the trial court then says, well, my ruling is now law of the case. Of course, that's not true, because for law of the case, there actually has to be a decision by an appellate court on that point. And that's why we're here. And so what we're asking this court to do is to correct what happened in Coy. Coy did not change Shiro, nor did it have the ability to do it. The court didn't address this fundamental principle found right here in the West Digest that says the law becomes terms of the contract for which you can bring a breach of contract claim. And I think that fundamental principle takes care of everything else in this case. Now, there's also one other wrinkle to this case. This case, unlike Coy v. Travelers, where there was a direct contract between the PPO law basically says you have to enter into agreements with providers. Those are your provider agreements. And then there are regulations that detail that these are all the things that have to be in a provider agreement. Let me say the administrator then enters into agreements with payors, and here are all the things that must be in the payor agreement, two of which are they shall contain terms requiring a sentence for the patient to treat with a doctor, and terms, it's sort of the same, it flips out at the same point, terms saying that there will be financial penalties if you voluntarily choose to treat with a non-confirmed provider in a non-emergency situation. And so those terms have to be in the payor agreement. And as part of the law and the definitions of administrator and beneficiary and the statute which talks about limited benefits, those all are terms of any payor agreement that employers have. Now, the question in this case is further compounded because we're not even sure what employers has here. The trial court presumed employers entered into an agreement with Fair Isaac, a software company. The trial court presumed that Fair Isaac was an authorized agent of First Health. Well, we know Fair Isaac is not a registered PPO administrator, so it has no ability to establish a PPO in the state of Illinois. So the next question is in the provider agreement it says that First Health or its authorized agent may enter into the payor agreement. Now, it has to be a written instrument, an instrument which, of course, as we all know, again, from Black's law dictionary or law school, an instrument is a writing. There has been no evidence of a writing between Fair Isaac and First Health. There's no evidence of agency other than employers' representatives in their deposition saying, of course we have authority to take these PPO discounts because Fair Isaac told us we could. You've got to go ask First Health that question. First Health is the only one that can create an agent on behalf of itself. And we know from other litigation how First Health always did that. Let me ask a question about that. Your opposing counsel in his brief says that it's clear that First Health assessed the discounts through this Fair Isaac agreement, that when the EORs were submitted that it was First Health who assessed the PPO discounts. It is true that Fair Isaac had access to First Health bill review information, yes. I'm not so sure that the record of discovery has verified that First Health actually went and knowingly participated in this. Is it from that that the trial court presumed that Fair Isaac was an authorized representative of First Health? No. What he presumed it from was because he presumed that First Health was an authorized representative because he said that the employers' witnesses in their depositions testified that they had permission, that they were told that. From Fair Isaac, but not from First Health. Correct. So there's no evidence in the record coming from First Health in which anybody says or testifies or whatever that there was any kind of an agreement between Fair Isaac and First Health. Not at this point. No. Did they work? Did the Fair Isaac work at all with First Health at all? They didn't work at all, right? I don't know. I mean, somehow Fair Isaac, all I know is this, to be perfectly fair, I just know Fair Isaac somehow gained access to the list of First Health medical providers and their tax ID numbers so that they could run it, they could move it through and take these discounts from the doctors. So they were chopping off money left and right from the doctors, and I know that, for example, employers was paying 25 percent of that money that they were taking from the doctors to Fair Isaac. Do I know whether there was a kickback from Fair Isaac to First Health? I don't know. There may be, for all I know, there may be a legitimate agreement, but we subpoenaed First Health, got nothing in response. Fair Isaac was a third-party defendant, got nothing to produce from them. I mean, so, you know, when we're sitting here, all I can tell you is that I've asked for a discovery, I've subpoenaed people, I've served them with written discovery, and we have yet to get any documentation to show that there's a legitimate connection between Fair Isaac and First Health. And so we have that complication on top of everything. Well, setting aside whether or not COI was correctly decided, there is a question, what you're saying is there is a question of whether this case is on the same footing as COI because of the lack of a clear authority between First Health and Fair Isaac. Absolutely. I mean, that's a significant distinction all along the lines. And I'll acknowledge this, you know, I think everybody forgets, you know, I'm limited in some of my discovery requests on the case to a certain point. When we're talking about class certification, we're not supposed to really get into the merits. We're supposed to touch the merits enough so that the court can be advised about whether the issues are common or individualized as to those particular claims, but we're not supposed to be deciding those issues. And so will there be some further evidence tonight? I honestly don't know, but I can tell you right now, as of right now, that is a distinction. But COI doesn't just dissolve with that distinction in this case because, again, this all started with the decertification of this class. You know, after the appellate review of the certification order, it goes through the appellate process, and we get back down, and I believe it was Judge Stack had retired and Judge Mudge took over, and they immediately filed a motion to decertify. And that decertification order, when you have a successive judge, there has to be a change in circumstance. Well, we know there was nothing that changed in the facts of the situation, and the trial court put in his order that COI was a change in the law. So the court's still going to have to confront the fundamental problem with the statements in COI that, no wonder that implying these terms is a rewriting of the contract, when Shiro says rejected that very argument back in 1960. I mean, back in 1960, the court said the defendants argued that this would be unfair and it would be basically a rewriting of the agreement, and the court said no. Those terms are there. And then it naturally flows, because in all fairness to Justice Bomer, you didn't know. That issue wasn't raised, and you didn't know about the Supreme Court president at the time. And so when you don't know that those are terms of the contract, it's very easy for the next sentence to be, because there's no terms of the contract, you don't have a permission to contract claim. And I think Shiro wipes out that part of the COI opinion and gets us back on ground with what has been precedent in the state since 1832, that the terms of law are, the laws and regulations are terms of every contract in the state of Illinois, as if expressly written in there. Now, the other issue that I know that the defendants raised, which I just want to briefly touch on, is for the first time in appeal, they argued that, well, maybe they contracted out of these PPO requirements, and there's no evidence of that. As a matter of fact, in addition, I think they weighed that. The trial court never found any such language. The trial court never applied that precedent, because the trial court said he was bound to follow COI, regardless of that Supreme Court precedent. But in order to do that, there's got to be two elements. There's got to be clear indication that the parties were trying to avoid the effects of the law, number one. And number two, you've got to be able to do it, because it's not fundamental public policy. And a perfect example, I think, is there's a bank holiday act in Illinois, which basically says these are the holidays for the banks in Illinois. And banks, of course, can contract out of that, because that's not fundamental Illinois public policy. And so saying that your payment is due on Monday, that has to be Labor Day, well, that's fine. You can contract out of that. But in this situation, you have a PPO law in 1985 that was enacted specifically to allow PPOs and these incentives that are synonymous with PPOs in Illinois. And the legislature, when it was set forth, they said that this article, if it conflicts with any other articles, shall supersede. So I think there's clear evidence that they didn't contract, nor could they, out of this requirement. And I will point out that even in the change request, they specifically said EMC agreed to comply with all applicable laws, rules, and or regulations that apply. And we know that they understood this to be a PPO agreement. And, you know, one question I'm asked from a lot of the trial judges is because I know I get this question a lot, and I just want to head it off. So did the doctors agree to this? Well, didn't they agree to the discounts? Well, that presumes that they weren't agreeing it based upon the context and the auspices of the PPO law and the incentives that are required of that. So, of course, they agreed to the discounts whenever there is incentives. So this is a situation where we're trying to shoehorn an agreement into the PPO law. This is an agreement made under the auspices of the PPO law that the defendants are trying to shoehorn into the work comp situation. And I know employers also raised that in work comp, you know, mistreaters argue that we'll have to violate the law. No. You don't take a PPO discount then. There's no incentive. You don't take a PPO discount. It's that simple. And the only time, and this was another issue that I think because, again, you know, we filed a petition for rehearing the employee. It was denied, but the court revisited some of the issues after that. And so I never really got a chance to respond to this, but the class are the people, the doctors who treated patients who had unfettered choice. Because in those situations, there's a breach. There's no incentive. When they haven't, when the employer gets to choose, that's when there's compliance because there is an incentive. So we can never have those situations in our class, and that's why they've been excluded out of our class. Because if the employer, or I'm sorry, if the injured worker, let me use that, so I'm not saying employer or employee. If the injured worker exhausts his or her two choices of providers, there's an incentive to go to where the employer or the insurance company tells you to go. Because your treatment's covered, and if you don't, it's not. That's a huge financial incentive. If there's a panel, if you go to the panel, you're covered. If you don't go to the panel, the act makes it very clear. It's at your own expense. Again, that's a huge financial incentive. So we specifically carved those situations out because those are proper. Those are arguably proper. There's no damage to the doctors in those situations because in those limited situations, there was an incentive for the injured worker to select this preferred provider. But we're not arguing that they had to provide incentives when they couldn't under the work count. What we're saying is you should have never taken the PPO discount. You shouldn't have tried to shoehorn this PPO arrangement into the work count. Because when you look at the effects of it, the effects of it are very simple. There was a statutory fee schedule, and the PPO gives a significant discount off of that fee schedule. And so the doctors got nothing in return. They didn't get any more patients. The injured workers never had any incentive to go treat with them at the very beginning during their first two choices. But the defendant just kept chopping the bills off of the doctors. And they didn't look like they were using a legitimate PPO discount. Thank you. Thank you. Mr. Pinn. Good morning, Your Honor. Good morning, Counsel. I want to start with the question that seems to be at issue here. And it really seems to be two questions. One, are we re-arguing and revisiting the Coy versus Travers case? And secondly, does this case, is this case similar enough on a factual level to match the Coy case and justify the entry of judgment here? So I want to start with the record in our case. The plaintiff alleged in his complaint that employers, my client, through an arrangement with Fair Isaac, submitted plaintiff's medical bills for review by First Health. That's something they alleged in their complaint. They further alleged that employers, my client, gained access to the discounted reimbursement amounts associated with plaintiffs and the class's provider agreements with First Health. They alleged that. Dr. Bemis gave a deposition in this case in which he testified about the commencement of his PPO payor agreement in 1998 with this company, Community Care Network, which is not a part of this case. He admitted in his deposition he was never guaranteed a minimum number of patients or an increase in revenues. And he accepted my client's payment of a medical bill, even though my client paid him on a $62 bill $14 less than he had billed, and did not challenge that until his lawsuit. EMC, my client, we filed a third-party complaint against Fair Isaac. In our agreement with Fair Isaac, there is an indemnity provision. And so I alleged that to the extent that we had any liability in this case, Fair Isaac should indemnify EMC for that. In that complaint, I allege, in that third-party complaint, we allege that EMC's contract with Fair Isaac gave it access for a substantial fee to the First Health PPO network. Fair Isaac admitted that allegation in its answer. EMC then produced in discovery all of its contracts over the years with Fair Isaac and the predecessor companies. Those contracts speak for themselves. They're in the record in this court. And they include payor provisions that are identical to those that were present between travelers and the PPO administrator in the coin case. Specifically, in June of 1998, EMC entered into its first agreement. It was with a company called CompReview. And it was a software license agreement. And it stated that for a fee, EMC would get use of the bill review computer program and access to the network provider savings. In Section 6.1 of that agreement, CompReview represented that it was the legal owner of the software and the licenses. There was an arbitration clause in that contract and a choice of forum and choice of loft clause for California law. And it also contemplated and listed that EMC for Illinois would be gaining access to an external network by a company called HFN. So that's 1998. EMC has contractual access in Illinois to a company called HFN. That agreement stays in effect for roughly six years until February of 2001 when there's an amendment to that agreement. Again, this has all been produced in discovery in this case. This is now six years after Dr. Bemis entered into his payor. This is called the change request services amendment to the prior agreement. And it talks about the addition of new PPO networks that EMC would get access to. And it states in Illinois, for workers' comp, EMC would now have access to the first health network as of February 1st, 2004. Neither of those agreements says anything requiring steerage, direction, channeling. Instead, like all of the contracts in all of these cases, including the travelers' case, EMC agreed to encourage claimants to use services of the contract providers through workplace posters, directories, educational materials, etc., unless prohibited by applicable law, only to the extent allowed by law. Now, in September of 2006, there's a further amendment to that agreement. And this is the agreement that's in place at the time that this patient comes to see Dr. Bemis. The agreement, in terms of the payor language, remains exactly the same. Again, EMC still has access to first health and still will do what it can to encourage claimants to use providers to the extent allowed by law. But this agreement also has provision 10.13 that says nothing in this agreement shall be deemed to create any right or benefit in any person, not a party or two. Dr. Bemis is not a party or two. It has a merger clause stating that the agreement is the full and entire understanding between the parties. That all prior agreements are terminated. That is the agreement that was in effect on the date that the patient, whose name I will leave out of the record, I'm sure, has long since recovered from these injuries. That's the agreement that was in place when this patient came to Dr. Bemis' office. He had a workplace injury at his place of work, apparently a knee injury. He came in for a couple of manipulation chiropractic treatments in September 2004. And Dr. Bemis testified in his deposition. We went through the records of this patient. And we asked Dr. Bemis on the intake form, does it indicate how this patient came to see you? And he said it does. It shows that he was referred by his employer. So this patient, which is the patient in question, it's the only claim remaining in this case, was factually, and this is admitted by the doctor, referred by his employer to Dr. Bemis. So he got the type of legal channeling or steerage that was allowed. EMC also presented two corporate designees for deposition in this case. And it's important to talk about them both. The first was the woman who helped vet and select Fair Isaac, the Fair Isaac contract back in 1998. And the second was an employee who was in charge of the enforcement and operation of that contract in terms of how EMC did its claims reviews. And both brought, I think, important perspectives. So the first witness, Mary Jane Allgood, who was in charge of medical contracting and compliance at EMC, testifies that in 1998, they were shopping for access to PPO networks and someone who could provide them with the type of software and computing that could handle volumes of claims like this. And Fair Isaac fit that bill. And Fair Isaac brought them two PPO networks, one called Corvell and a second one called First Health. She testified that Fair Isaac presented EMC with the general contractual templates that First Health used in its provider agreements so that EMC could review them. She testified that EMC vetted and investigated these networks, their coverage, and how they matched up with EMC's business in terms of the business they wrote in the geographic areas. She testified that Fair Isaac did not require EMC to steer or direct patients other than in the ways stated in the agreement. She testified that EMC, through this agreement, was provided what she called an electronic bridge to First Health, over which EMC transmitted claims information directly to First Health. Not to Fair Isaac, but directly to First Health. And she testified that EMC took steps to comply with the terms of the agreement by encouraging claimants to use PPO providers. They did that by providing directories. They held educational meetings at employer locations where they talked about the treatment providers that were available to them. And they encouraged claimants to the extent allowed by applicable law. Again, the phrase that matches what was present in court. Kathleen Newsom was the second witness to testify. She is the Medical Services Claims Manager at EMC. So now that the contract is entered into and is handed over to the Claims Department, this is the employee who is in charge of overseeing how these claims were then handled. She testified that Fair Isaac's software program, called the Smart Advisor Program, again, gave access to EMC to multiple PPO networks, including, in Illinois, the First Health Network. She testified that in 2004, when the agreement was amended to specifically include First Health in Illinois for workers' comp, EMC then notified all of its 32 state branch offices of the fact that First Health was now going to be the contractor for Illinois. And she importantly talks about how, at EMC, what they did is they would get a claim in. They would have it on the computer. They would make sure that it was an employer that they insured. They would try and make sure that the injury appeared to be something that was work-related to do a bit of due diligence. And then, using this electronic bridge, again, this is the woman who oversees how this was actually done in reality, not in academic terms. They used this electronic bridge. The bills were sent to First Health. They were not sent to Fair Isaac. They were sent to First Health. First Health repriced them and sent them back. EMC then took that information, wrote the check, and issued the EORs. First Health ratified this agreement because, in unrebutted testimony, EMC provided the bills to First Health. First Health repriced them. There was no objection to EMC having access to their network at all. Now, in addition to this factual record, there's also the additional admission by the plaintiff, Dr. Davis, as I said, that this patient was, in fact, referred to him by his employer. And in addition to that, in connection with a motion that the plaintiffs filed in the circuit court when they moved for class certification initially, they filed this motion and stated the following uncontested facts that they presented to the court in support of their motion. And those facts included, as I cite in my brief, the following, which is that employers' mutual casualty and its affiliates entered into a software license agreement with Comperview, who later became Fair Isaac. Then on February 1, 2004, that software license between Comperview and employers was amended to include First Health PPO network for workers' compensation claims in Illinois. That is an uncontested fact that the plaintiff presented to the circuit court judge in this case in a motion intending for the judge to rely on that information. The judge did rely on it, and the plaintiffs won that motion. They further, in the same motion, said the following. After the bills had been entered into the Smart Advisor program by EMC, they are sent through the software to First Health, who then applies the PPO network discounts. Comperview only provides the electronic bridge between employers and First Health. At the time, those facts that the plaintiffs told the circuit court were uncontested, they suited the arguments that the plaintiff was making to the court at that time. That predated this court's Coy v. Travers decision. Since then, the plaintiff now wants to flip-flop that and take back these facts that they alleged in court. And I believe, and EMC believes, that the rules of judicial estoppel should prevent that from happening. You cannot take a position in the circuit court that suits your needs at the time and then take an opposite position later on in the litigation just because the exigencies of the circumstances have not changed. This was a statement they made, and it's an issue of interest. So my clients have produced contracts. They've produced witnesses. There are hundreds of pages of testimony. In the eight years that this case has been pending before the circuit court, there has been no evidence presented that challenges the fact, the uncontested fact, that EMC had legal contractual access to the First Health network. At some point during the eight years that this case was pending in the circuit court, the plaintiff should have come forward with evidence that my client did not have access to First Health if that evidence existed. In our view, the plaintiffs were in a unique position to do that because, as this court may know, the same plaintiffs filed many lawsuits under these exact same theories against many insurance companies, PPO administrators, third-party administrators, et cetera. One of the companies that Dr. Benes sued was First Health. Now, that record may have been sealed, or there may have been confidentiality agreements. I don't know. I wasn't a party to that case, or EMC wasn't a party to that case. But the plaintiff was, and certainly the plaintiff not only had jurisdiction over First Health but had discovery rights over First Health. They were in a unique position to obtain information from First Health that challenged the fact that EMC had access to First Health PPO, and they didn't. So we believe it rings hollow for the plaintiff to claim that they need to be given access to discovery rights. There was no—at the circuit court level, there was no prohibition against discovery. We were never told, you can only conduct class discovery now and we'll do merits discovery later. No such ruling was ever made. Discovery was on all subjects was left wide open, and plaintiffs had unfettered access. My clients produced everything that they had. There's no complaint that my clients were in any way dilatory or deficient in discovery in this case. So then the question is, are we re-arguing COI versus travelers, which I think is really what is at the heart of what's happening here. And if we are, it's because of the number and the scope and the breadth of lawsuits that were brought under the same theory. It's our position that the COI case brought clarity to an issue that was open at the time. And for consistency's sake and for all the other cases that are pending, that it is imperative for this court to remain true to COI. The same plaintiff, Dr. Frank Bemis and his chiropractic service were the plaintiffs in COI. The same theories of recovery were sought in COI against travelers as they are sought against EMC, in this case that being consumer fraud, breach of contract, unjust enrichment. The class definition that was initially posited is identical. You just take out the word travelers and plug in EMC and it's identical. The PPO administrator, First Health, is the same in both cases. Dr. Bemis' provider agreement with Community Care Network, that's the agreement that was in the COI case. It's also the exact same agreement that's involved in our case. And in COI, Your Honors found that that agreement clearly contemplated workers' comp. It clearly did not promise Dr. Bemis any guarantee of channeling or direction of patients. In both our case and in COI, both cases were initially certified, again, by the same circuit court judge. Both were subsequently decertified, COI following this court's ruling in May 2011, modified ruling in our case at the circuit court level on the heels of this court's ruling. The PAYOR agreements are identical in their substantive terms. Travelers had a managed care services agreement with Healthcare Compare. Travelers was promised for a fee access to the network for its workers' compensation claim. That's what this court found in the COI case. EMC had a software license agreement and subsequent change request of services in which for a fee it was provided access to the First Health workers' compensation PPO network. Nowhere in the Travelers agreement, nowhere in the EMC agreement, regardless of the titles, nowhere was either company required to direct or channel patients to these doctors. In both agreements, they were encouraged to encourage the claimants to see providers in the network to the extent allowed by law. Nowhere in Dr. Bemis' provider agreement was he promised patient steerage. The PAYOR agreements also, as we indicated, both have provision saying that there are no intended third-party beneficiaries, which Dr. Bemis was attempting to be in this case. The only promise in the PAYOR agreements by the companies in both cases was the promise to encourage patients to the extent allowed by law. In your brief, pages second, it has about the fifth clause. Can you tell that again to me? Fifth, that neither PAYOR had a direct contract with the... What page? Page two. Oh, sorry. Okay. Tell me the fifth sentence there, the fifth. Neither the PAYOR had a direct contract with the First Health. Tell me what that's about. Well, the PPO administrator, as far as I... And I wasn't party to the Traveler's case. I'm reading the opinions. The PPO administrator in both cases was First Health. And Traveler's did not have a contract with First Health. It had a contract with a predecessor company. And, again, apparently there was First Health in... I don't know if they purchased the assets or what sort of corporate structure change there was, but there was some contractual change over there that was not in the record. And my point is that in our case, again, we didn't have a... EMC did not have a contract with First Health. It had access to the First Health network through this Fair Isaac agreement. In Traveler's, Traveler's didn't have a contract with First Health. It had a contract with a predecessor company that, again, according to the opinion, for a fee, gave it access to the network. Thank you, Chairman. Thank you. Rebaba? Thank you, Your Honor. I think, as Justice Fulmer just pointed out, when you make a statement that neither pair had a direct contract with First Health, First Health's history is somewhat convoluted, but even in the Coy opinion, I know, Justice Fulmer, you noted that Healthcare Compare was the predecessor company to First Health. And I even gave the court the file number where, under Secretary of State records, Healthcare Compare with the old court name file 529-00743. So there's no doubt that there was a direct contract. There was a direct payroll agreement in that situation. But what you didn't hear Mr. Pender say, you didn't hear him talk about Shiro. You didn't hear him talk about, well, I'll put my digest back there, Section 167 of contracts. You didn't hear any argument about that. He concedes that's a law. The question is, is this panel going to enforce that Supreme Court precedent in this situation, especially when we have a situation where the PPO statute in law may mandate specific terms in a payroll agreement. Now, Mr. Pender spent a lot of his time talking about nuance. He was being very nuanced in what he said. He said, we're talking about access. Well, we all have access to Walmart. But that doesn't mean we can walk out with any of the merchandise without paying for it. So this isn't about access. This is about having a contractual right. And that's another thing he was very nuanced about. When he's talking about his contractual right, my client did nothing wrong. And maybe they firmly believe that. Maybe they're hooding it by Fair Isaac. I don't know. But all I know is that they're claiming a PPO discount, which only arises out of a contractual relationship defined by the PPO law. And so the agreement that gives them the right to the discount is the provider agreement. And when you look at the provider agreement, it makes it very clear that this is a PPO agreement and that the payor, if there is one, is supposed to offer a PPO plan. We have it very clear on this record that they never once offered a PPO plan. So how can you be taking a PPO discount when you don't offer a PPO plan? You simply can't. The contracts fall apart. And to also say that there's no contractual relationship between employers and plaintiffs, that may be true under these circumstances. But once again, how do you claim a contractual right? You need that contractual relationship to be able to say, I get this discount in exchange for something. Now, his in exchange for something is that, well, he had to encourage. There's no doubt. There's language that says you have to encourage workers to treat with doctors. But that doesn't negate what the statute and the regulation demand, which is terms requiring incentives to utilize that doctor. Didn't respond at all. So I'm not re-arguing Coy v. Travelers. To some extent, I have to because the trial court completely unraveled this case and decided not to file a Supreme Court precedent because of Coy v. Travelers. I'm just trying to get the right result here, which is we have long-established precedent that the laws are terms of the contract. And I can't think of any other statute where it mandates specific contractual terms in a private agreement that is authorized under the statutory regime. Maybe the HMO statute as well. But this is a unique situation here. This is more unique than the situation in Shira, where all you have is a city ordinance. You have a contractual relationship that has to be established in a certain way through an administrator where the definition includes incentives, and you just walk right down through that process. With regard to first health and ratifying, I don't know. Maybe that will turn out to be the case. I think, Justice Stewart, you pointed that out. We haven't gotten far enough. All I do know is that what did come out of our litigation with first health was two things. Number one, first health agreed. We never told anybody that there didn't have to be financial incentives, not once. And that is the evidence, and we've got evidence of that in the record, where the first health statements are that they've got a direct and direct means financial incentives, and if you don't have financial incentives, the whole concept of PPO collapses. But number two, what came out of it was reseller agreements. We have evidence in the record, and we gave this to the trial court. We said, look, where first health creates an authorized representative, they do it through this reseller agreement. We didn't have one. Thank you, counsel. Thank you. We will take this matter under advisement.